476 So.2d 1282 (1985)
Alan Max JACOBSON, Petitioner,
v.
STATE of Florida, Respondent.
No. 60592.
Supreme Court of Florida.
October 3, 1985.
*1283 Daniel W. Levin and Charles H. Snowden, Miami, for petitioner.
Jim Smith, Atty. Gen. and Theda R. James, Asst. Atty. Gen., Miami, for respondent.
EHRLICH, Justice.
This interlocutory appeal of an order granting a motion to suppress comes before the Court from the Third District Court of Appeal. State v. Jacobson, 398 So.2d 857 (Fla. 3d DCA 1981). We take jurisdiction because the district court's decision expressly and directly conflicts with Vollmer v. State, 337 So.2d 1024 (Fla. 2d DCA 1976), cert. denied, 347 So.2d 432 (Fla. 1977). Art. V, § 3(b)(3), Fla. Const.
Defendant Jacobson and a traveling companion, Baker, were observed by Detectives Johnson and Pearson at Miami International Airport in the early afternoon of July 31, 1979. The detectives were working a plainclothes narcotics detail, assigned to the airport by the Dade County Public Safety Department. The officers watched and listened as Jacobson and Baker inquired about a flight to Los Angeles. Because the two men showed many of the characteristics drug couriers often exhibit, the detectives decided to approach the two suspects. The detectives stopped the pair in a public concourse as they walked away from the ticket counter where they had learned of the missed flight. Johnson stood in front of Baker, Pearson stood close to Jacobson.
Pearson showed his badge to Jacobson and asked if they could talk. Jacobson assented and, on request, produced first his plane ticket and then his driver's license for Pearson's inspection. Pearson, finding no discrepancy between the names on the two documents, returned them. Jacobson had a Florida driver's license and told Pearson he was from Florida. However, Johnson then asked Jacobson if he was going to Los Angeles to visit friends and if he was from that area. Jacobson answered affirmatively. The detectives testified that this ambiguity in residency, and Jacobson's growing nervousness, increased their suspicions.
At this point, Pearson told Jacobson he was a narcotics officer and asked if he could search Jacobson's tote bag, the only luggage he was carrying. He also told Jacobson he did not have to consent to the search. Jacobson said "go ahead and search my fucking bag." Pearson asked if he would like to move to a less crowded place, Jacobson agreed and moved the bag several yards, out of the main flow of passenger traffic. Jacobson unzipped the bag and he and Pearson knelt as the detective *1284 searched the bag. Pearson found no contraband in the bag.
Approximately the same procedure was undertaken by Detective Johnson with Baker, now separated from Pearson and Jacobson by some distance. Johnson discovered what turned out to be bags of cocaine concealed on Baker's legs. As Baker was being handcuffed, Jacobson looked up and saw his traveling companion's predicament. Pearson testified that a look of "sheer fright" came across Jacobson's face, and he stood and ran out of the concourse. Pearson pursued Jacobson, finally grabbing his belt and saying "hold it" when he caught up with Jacobson in an airport parking area. According to Pearson, Jacobson tried to break away but two uniformed officers immediately appeared and Jacobson stopped struggling. Pearson then told Jacobson he was under arrest and handcuffed him. Jacobson was returned to the concourse where Johnson and Baker had remained. Detective Johnson searched Jacobson and found packages of cocaine on his legs, hidden in the same manner as on Baker. The two were then taken to jail. Although Detective Pearson did not tell Jacobson what he was being arrested for at the scene, a charge of resisting arrest without violence was listed on the arrest report. § 843.02, Fla. Stat. (1979).
In its suppression order, the trial court found that the initial stop was illegal, that neither Baker nor Jacobson had voluntarily consented to the searches which produced the cocaine, and that the evidence should be suppressed because it was the result of an illegal seizure and search. The state did not appeal the suppression order as to Baker, but did challenge in Jacobson's case. The district court found that, while the initial stop was illegal, Jacobson's flight and subsequent arrest broke the causal chain of events flowing from the illegal stop, and that the evidence discovered in the search pursuant to the arrest was validly obtained.
In Vollmer, a police officer stopped the defendant as he walked along a Lakeland street in the middle of the night.
There was no evidence of any criminal activity in this area of Lakeland on that morning. The officer had no reason to believe that the appellant had committed any crime. But, as the officer drove by, he noticed the appellant watching the patrol car. He then turned his car around to further observe the appellant, whereupon he stopped him and asked for his name. When the appellant replied that his name was "Bill Hollis," the officer inquired as to whether he had any identification. When appellant answered in the negative, the officer next asked whether appellant had a wallet. Appellant then replied "yes," and produced a wallet. As appellant opened the wallet the officer saw a Florida driver's license and asked to inspect it. Appellant gave it to the officer and upon inspection, the officer determined that the license bore the name "John Brian Vollmer." When Officer Alexander read that name aloud, appellant "took off running" and the officer gave chase on foot. When the officer caught appellant a struggle ensued. Appellant was arrested for resisting an officer with violence. A subsequent search of his person at the police station revealed LSD and cocaine.
337 So.2d at 1025.
The district court held that the defendant's behavior before the stop did not justify a stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) or the Florida Stop and Frisk Law, section 901.151, Florida Statutes (1975). Because the initial stop was illegal, the court reasoned, the information gleaned from the illegal stop, i.e. the inconsistency between the defendant's verbal identification and the driver's license, "does not validate the policeman's actions." 337 So.2d at 1026. Because the officer was not engaged "in the execution of legal process or in the lawful execution of any legal duty," section 843.01, Florida Statutes (resisting officer with violence to his person), the arrest for resisting failed. The contraband seized was not discovered in a search pursuant to *1285 a legal arrest and therefore should have been suppressed.
Vollmer conflicts with the instant case because, in the former case, an arrest for resisting after flight from a putatively illegal stop was held improper vis-a-vis a search incident to the arrest, while subjudice the arrest and search were held proper.
However, we conclude that the stop in this case was at all times within the bounds of the law, that the arrest for resisting was lawful, and that the evidence discovered pursuant to that arrest was properly seized. We have jurisdiction because of the facial conflict between Vollmer and this case. Having jurisdiction, we have jurisdiction over all issues, Savoie v. State, 422 So.2d 308 (Fla. 1982), and dispose of the case on a ground other than the conflict ground. Our decision moots the conflict issue, whether flight from an illegal stop breaks the claim of illegality, which remains undecided here.

THE STOP
The initial stop by the detectives was a consensual stop. Consent remained until Jacobson's flight, at which point Detective Pearson had sufficient grounds to detain Jacobson under Terry. In the process of attempting to detain the defendant, the defendant resisted and an arrest on that ground was proper. The search incident to lawful arrest therefore produced admissible evidence.
The United States Supreme Court has held that there is no "litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop." Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). A consensual encounter occurs when a police officer approaches a citizen and interacts in a manner such that a reasonable person would believe he was free to terminate the encounter and leave. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Fourth amendment protections are not triggered.
While an officer, like any other citizen, is free to approach someone and engage him in conversation, there comes a point when the citizen approached is no longer free to decline to converse with the officer. This point, when fourth amendment protections are triggered, occurs when there is "a show of official authority such that `a reasonable person would have believed he was not free to leave.'" Florida v. Royer, 460 U.S. at 502, 103 S.Ct. at 1326 (quoting Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.)). In Royer, Justice Brennan suggests that "once an officer has identified himself and asked a traveller for identification and his airline ticket, the traveller has been `seized' within the meaning of the Fourth Amendment." Royer, 460 U.S. at 511, 103 S.Ct. at 1331 (Brennan, J., concurring in result). The plurality held that such a situation alone would be insufficient to constitute a seizure, but did find that additional actions by police supported a finding of seizure. The officers retained the identification and ticket, asked the defendant to accompany them to a small room, and brought his luggage to the room to be searched. Royer was, as a practical matter, under arrest according to the plurality.
The facts in the case before us suggest that the actions by detectives Johnson and Pearson did not reach the level of a seizure during the initial stop, as far as Jacobson was concerned. Detective Johnson stood in front of Baker when the first contact was made; Pearson told Jacobson that he was a narcotics officer; the officers retained the suspects' identification and airline tickets only long enough to examine them, and promptly returned them; Pearson testified he told Jacobson he didn't have to allow the detective to search the bag; Pearson suggested that the search of the bag he made in a "less crowded place;" and Jacobson acquiesced to the request to search the bag.
In other words, there were none of the indicia of control over the person or his *1286 property which dictated a conclusion in Royer that a seizure had occurred. In fact, there was less objective control here than in Mendenhall, where the Court found no seizure had occurred. Two added elements of control were present in Mendenhall  the suspect was taken to an office in the terminal, and she was strip-searched by a female officer. The Mendenhall court found that the suspect's consent to go to the office and be searched kept the encounter from being a seizure.
The relatively recent case of Florida v. Rodriguez, ___ U.S. ___, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) lends some support to the conclusion that the encounter in this case escalated into an illegal Terry stop at some point before the drugs were found on Baker's legs. The Court wrote:
Assuming without deciding, that after respondent agreed to talk with police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage, there was a "seizure" for purposes of the Fourth Amendment, we hold that any such seizure was justified by "articulable suspicion."
Id., 105 S.Ct. at 311. We distinguish Rodriguez because, while the defendants in that case and sub judice were travellers stopped at an airport, the Rodriguez suspects had already exhibited sufficient suspicious behavior when stopped.
Before the officers even spoke to the three confederates, one by one they had sighted the plain clothes officers and had spoken furtively to one another. One was twice overheard urging the others to "get out of here." Respondent's strange movements in his attempt to evade the officers ["His legs were pumping up and down very fast and not covering much ground... ." Id. 105 S.Ct. at 309] aroused further justifiable suspicion, and so did the contradictory statements concerning the identities of [two of the suspects].
Id.
The suspects' conduct in Rodriguez was thus unique, extending well beyond "profile" behavior, whereas the suspects in this case presented little suspicious behavior beyond "profile" characteristics. In the instant case, we find too little to conclude that an "articulable suspicion" existed to detain Jacobson until the cocaine was discovered on Baker's legs.
A person may be subjected to a limited seizure under Terry v. Ohio when an officer has a reasonable and articulable suspicion that the person may be engaged in criminal activity. Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). Reid v. Georgia has established the principle that similarities between a suspect and a "drug courier profile" are insufficient to establish the requisite reasonable and articulable suspicion. While the detectives in this case did not explicitly state that their suspicions were based on a "profile," their testimony clearly shows that this is exactly what triggered their investigation. The factors the detectives testified they relied on include: 1. Travel between two centers of narcotics trafficking; 2. Travel with only minimal luggage; 3. Late arrival at the airport; 4. Nervousness while trying to get a flight out; and 5. The suspects were in the age group normally involved in drug trafficking. All these factors were perceived before the detectives made their investigative stop. Nothing was noted which was unique to the two suspects prior to the stop. In Reid the Court noted that even when the profile factors were supported by the added observation that the suspect appeared to be attempting to conceal the fact that he was traveling with another person, the grounds for suspicion were insufficient to justify a seizure. In the case before us, there is no indication that any unique factors had been observed by the detectives before they stopped Jacobson and Baker. Thus, the facts in this case argue even more strongly than in Reid that there were initially no grounds for a Terry stop. While the detectives learned after the stop was made that the tickets had been purchased with cash, and that the suspects had apparently stayed at a motel near the airport (although *1287 this later turned out to be incorrect), that the tickets were one way, and that the suspects grew increasingly nervous, this added little basis for suspicion other than to reenforce the match with the "profile."
Perhaps the only information beyond the match with the profile which could justify a seizure was the apparent discrepancy between Jacobson's first statement that he was from Florida, and his later answer to Johnson's question. Even in this instance, the discrepancy is ambiguous, i.e. many people have Florida driver's licenses and are "from" Florida, but are also "from" somewhere else (perhaps their hometown). In any event, this information was gleaned after the initial stop, and even if it had been learned before the stop escalated to an investigative stop, it was insufficient to justify a seizure.

THE FLIGHT AND ARREST
Had Jacobson's cocaine been discovered as the result of a body search conducted without his permission during the initial stop, we would have to go no further to find that the evidence had been illegally obtained. However, the stop of Jacobson here was consensual until the moment the cocaine was discovered on his companion's legs. At that point, the detectives had an articulable suspicion that Jacobson might be engaged in criminal behavior. Jacobson withdrew his consent by running at the precise instant that Detective Pearson lost the necessity of consent. We therefore do not have to and do not, decide whether Jacobson's flight alone would have been enough, besides the previously discussed circumstances, to have created an articulable suspicion. At the very least, the officers would have been justified to suspect Jacobson was involved in a conspiracy to smuggle cocaine, if not actually carrying some on his person. Once the articulable suspicion was raised, Detective Pearson was justified in pursuing Jacobson to detain him for further questioning under Terry. Physically restraining someone seeking to escape from a legal Terry stop is the "lawful execution of [a] legal duty," section 843.02, Florida Statutes. Jacobson resisted the detention when he struggled with Pearson after Pearson grabbed him, and the detective was therefore justified in arresting Jacobson for resisting an officer without violence. Although the arrest report says "resisting arrest," when, in fact, Jacobson was resisting execution of a lawful duty, section 843.02, also listed on the report, does not require that the officer be attempting to arrest the suspect. See, e.g., Kaiser v. State, 328 So.2d 570 (Fla. 3d DCA 1976) (charge of resisting officer with violence, section 843.01, proper when officer has legal right to detain suspect for questioning). Jacobson's arrest for resisting an officer without violence was therefore legal, and the search which revealed the cocaine was pursuant to lawful arrest.
The state has not challenged the trial court's ruling that the search of Baker was illegal, and that issue is not before us. However, we do not find that the police behavior indicates a bad faith attempt to inflict a "bad bust" on Baker in hopes of triggering action on the part of Jacobson which would give the officers grounds to detain or arrest him, a procedure which would raise issues other than those addressed here.

CONCLUSION
For the reasons discussed herein, we approve the decision of the district court but disapprove its opinion on the issue of legality of the stop.[*] We remand for further proceedings consistent herewith.
It is so ordered.
BOYD, C.J., and ADKINS, OVERTON, McDONALD and SHAW, JJ., concur.
NOTES
[*] Our decision reverses the district court's holding on the legality of the stop. While we approve the decision of the lower appellate court, i.e. the judgment reversing the trial court on the admissibility of the seized evidence, we disapprove the opinion on the legality of the stop. This moots, for us, the issue of flight from an illegal stop, and we have not addressed that issue. However, this does not necessarily nullify the district court's opinion regarding the flight issue, and thus we have not necessarily performed our duty of resolving conflict.

We can find no authority on the question of what becomes of a holding from a lower court on a "contingent issue," a question which exists only if an underlying question is resolved in one way, when a higher appellate court reverses the underlying question. Logic dictates that if the higher court's action moots the contingent question, the question is mooted for all purposes vis-a-vis law of the case, stare decisis, and conflict. We hold that a higher court decision on an underlying question which moots the contingent question renders the lower court's holding on the contingent question of no precedential value for law of the case, stare decisis, or conflict. In this case, the flight issue remains undecided by this Court and Vollmer is neither approved nor disapproved by this decision.