516 So.2d 1015 (1987)
STATE of Florida, Appellant,
v.
Paul Clive JOHNSON, Appellee.
No. 86-1537.
District Court of Appeal of Florida, Fifth District.
December 3, 1987.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Ellen D. Phillips, Asst. Atty. Gen., Daytona Beach, for appellant.
Lane S. Abraham, of Carl H. Lida, P.A., Miami, for appellee.
*1016 PER CURIAM.
Three hundred twenty-six pounds of cannabis were seized following a stop of defendant as he was driving north on Interstate 95 in Volusia County. The trooper stopped defendant solely because defendant fit the drug courier profile developed by the Florida Highway Patrol and the trooper's own profile. After the stop, the trooper observed facts giving rise to a reasonable suspicion that the defendant was a drug courier. The trial court granted defendant's motion to suppress the evidence seized after the stop on the sole ground that the initial stop was illegal. The State appeals. Because we are bound by the prior decision of this court where the drug courier profile developed by the same trooper was involved, in In re: Forfeiture of $6,003.00, 505 So.2d 668 (Fla. 5th DCA 1987), we must affirm. However, there are persuasive arguments in support of the validity of drug courier profiles as a basis for an investigatory traffic stop, which we believe warrant further discussion and review by the Supreme Court of Florida.
Drug trafficking has reached epidemic proportions in Florida.[1] The State submitted evidence showing that literally tons of narcotics pass through the State of Florida each and every day. Interstate 95 is a major pipeline of narcotics through the State. Recognizing the seriousness of the problem of drug trafficking, the United States Supreme Court has approved the use of profile characteristics in identifying drug couriers at airports. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).[2]But see Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); United States v. Smith, 799 F.2d 704 (11th Cir.1986). We also note that other Florida district courts have been confronted by this question and have reached varying conclusions on the matter. Many of the cases discussing the drug courier profile have involved airport stops. Under these circumstances, the courts have often found that the initial contact between the law enforcement officer and suspected drug courier was only a mere encounter, and not a seizure or even a Terry (v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) type stop. Thus, the question of whether the profile is sufficiently reliable to justify a Terry type stop has not been reached in these cases. See State v. Grant, 392 So.2d 1362 (Fla. 4th DCA 1981) (pre-Royer); Nease v. State, 442 So.2d 325 (Fla. 4th DCA 1983) (post-Royer). See also State v. Bankston, 435 So.2d 269 (Fla. 3d DCA 1983) (court declined to reexamine its dictum in its Royer decision that a "conformance, without more [e.o.] to one or more elements of the profile does not amount to articulable suspicion"). In those airport stop cases that have reached the issue, some courts have concluded that the profile characteristics do not establish reasonable suspicion, Martinez v. State, 414 So.2d 301 (Fla. 4th DCA 1982) (pre-Royer); Horvitz v. State, 433 So.2d 545 (Fla. 4th DCA 1983) (post-Royer). Others have given weight to the drug courier profile as a basis for investigatory stops. See Sands v. State, 414 So.2d 611, 616 (Fla. 3d DCA 1982) (drug courier profile was "suspicious behavior which warranted further scrutiny"); Carpenter v. State, 403 So.2d 1047 (Fla. 4th DCA 1981) (drug courier profile characteristics "could constitute the sort of founded suspicions necessary to justify the temporary detention of an airport passenger is some instances"); *1017 State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979) (drug courier profile and other facts known by officer justified investigatory stop). We also note that in two cases decided by Florida District Courts of Appeal involving traffic stops, the drug courier profile has been found insufficient to provide reasonable suspicion. See State v. Anderson, 479 So.2d 816 (Fla. 4th DCA 1985) (drug courier profile characteristics insufficient to provide founded suspicion to justify investigatory detention of suspected drug courier); Kayes v. State, 409 So.2d 1075 (Fla. 2d DCA 1981) (drug courier profile does not in and of itself create a well founded suspicion of criminal activity). However, these cases were both decided pre-Royer. At least one state Supreme court has upheld the detention of a motorist suspected of drug activity based on profile factors.[3] As of yet, the Florida supreme court has not directly addressed this issue.[4]
On June 4, 1985, Trooper Vogel of the Florida Highway Patrol was assigned to a special detail working with the Federal Drug Enforcement Administration. At approximately 4:15 A.M., the trooper observed a large luxury car traveling northbound on Interstate 95. The vehicle displayed Maryland license tags. The trooper commenced following the vehicle and clocked it at a speed of exactly 55 MPH, which was the speed limit in this area of the interstate. The trooper observed the driver glancing continuously into his rearview mirror. The trooper then signaled his lights and effectuated an "investigatory stop" of the vehicle. The trooper testified that the driver of the vehicle had not committed a traffic violation, but that he made the stop because he was suspicious of the driver's involvement in drug trafficking.
After stopping the driver, the trooper solicited from the defendant a New Jersey driver's license and a rental agreement for the vehicle. The trooper observed that the driver was wearing casual clothes. At this point, the trooper requested the defendant to exit the vehicle and a closer examination of the rental agreement indicated that it was issued to someone other than the defendant. The defendant at this time appeared to the trooper to be extremely nervous. The trooper noticed that the trunk lid of the vehicle appeared to be bulging upwards. The trooper was able to smell a strong odor of fabric softener emanating from the trunk. The trooper explained that fabric softener was often used to conceal the odor of marijuana. The trooper peered into the interior of the automobile and observed a spare tire and jack located on the rear floor of the car. At this point, the trooper asked the defendant if he could search the vehicle. The defendant refused. The trooper then summoned a narcotics dog. Fifteen to thirty minutes later, the dog arrived at the scene and alerted to the trunk area. The trunk was then opened and four large bales of marijuana weighing over 300 pounds were discovered within.
Trooper Vogel testified that as a 13 1/2 year veteran of the Florida Highway Patrol, he had gained extensive experience in identifying and arresting persons involved in transporting illegal drugs. Between March 5, 1984 and April 18, 1985, Vogel made arrests on 30 cases involving drug couriers. These were cases in which the vehicles were validly stopped for reasons *1018 other than the drug courier profile, in which drugs were subsequently discovered. From these cases, Vogel compiled a profile of characteristics common to the arrest. Some of these characteristics were:
(1) Day of the week
(2) Time of the day
(3) Type of vehicles involved
(4) Year of the vehicles
(5) Whether the vehicle is two door or four door
(6) The license tag of the vehicle
(7) The presence of a CB or radar detector
(8) The number of occupants in the vehicle
(9) The age grouping of the occupants
(10) The destination of the vehicle[5]
The particular factors relied upon by the trooper in this particular case were (1) that the time was 4:15 A.M.; (2) the defendant was alone; (3) the defendant was about 30 years old; (4) the car had out-of-state tags; (5) the car was a large model; (6) the defendant was a male; (7) the defendant was wearing casual clothes; (8) the defendant was driving in an "overly cautious" manner; (9) the defendant was driving northbound on Interstate 95, a known route for the transportation of illegal drugs.
The trial court in its written order specifically found these factors to be insufficient to establish reasonable suspicion that the defendant had engaged in criminal activity. Accordingly, the trial court suppressed the evidence found as a result of the search of the defendant's vehicle.
When a law enforcement officer suspects that an individual is involved in criminal activity, and his suspicion is founded upon reasonable inferences from specific and articulable facts, the officer is justified in seizing the suspect, even forcibly, for the purpose of conducting a brief investigation. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See also U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Although such a brief investigatory stop was originally premised on a street encounter between the police officer and a citizen, the analysis established in Terry has been extended to investigatory stops of automobiles as well. See Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); U.S. v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The touchstone for this analysis has always been the balancing of the government's interest in pursuing legitimate law enforcement objectives with the individual's right to be free from arbitrary and unreasonable interference by law officers. Terry v. Ohio. Ultimately, to pass constitutional scrutiny, an officer's conduct need only be reasonable.[6] Justice O'Connor cogently summarized this balancing test in U.S. v. Place, supra:
The exception to the probable-cause requirement for limited seizures of the person recognized in Terry and its progeny rests on a balancing of the competing interest to determine the reasonableness of the type of seizure involved within the meaning of "The Fourth Amendment's general proscription against unreasonable searches and seizures." 392 U.S., at 20, 88 S.Ct., at 1879. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive to the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.
Place, 462 U.S. at 703, 103 S.Ct. at 2642.
Applying this balancing test to the case before us it is clear that there exists a *1019 legitimate government interest in stopping the huge flow of drugs on interstate highways. See United States v. Mendenhall, 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (opinion of Powell, J.) ("[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit"). Balanced against the government's interest is the degree of intrusiveness of the highway stop, which in most cases is minimal. The trooper requests consent to search the stopped vehicle only if additional factors are discovered after the stop, i.e., extreme nervousness, conflicting stories between the driver and the passenger, a rental vehicle rented in someone else's name. If the detainee does not warrant further investigation, the trooper permits the detainee to continue his travels. Detainees are released within a few minutes if the trooper's suspicions are not further aroused by the presence of additional factors. If, after the stop, further indicia of drug trafficking exists, giving rise to probable cause, or if consent is given, the officer then searches the vehicle.
The difficulty in deciding whether the profile relied upon by Trooper Vogel here is sufficient to satisfy the reasonableness requirement is due, in part, to the indefiniteness and malleability of the "reasonable suspicion" standard, and the apparent willingness on the part of some courts to elevate it to a level which approaches, if it does not in fact reach, the standard of "probable cause." "Suspicion" implies a belief or opinion based on facts and circumstances which do not amount to proof; the apprehension of some fact upon slight evidence. Black's Law Dictionary, Fifth Edition, p. 1298. Obviously, suspicion does not equal probable cause. The Supreme Court has recently discussed the necessary flexibility of reasonable suspicion, saying that
Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances  the whole picture  must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. See, e.g., Brown v. Texas, supra, 443 U.S. [47], at 51, 99 S.Ct. [2637] at 2640 [61 L.Ed.2d 541]; United States v. Brignoni-Ponce, supra, 422 U.S., at 884, 95 S.Ct. at 2581.
The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions  inferences and deductions that might well elude an untrained person.
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in Terry v. Ohio, supra, said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth *1020 Amendment jurisprudence." [Emphasis in original].
United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).
In Cortez, border patrol officers were investigating the entry into this country of illegal aliens, who had apparently walked through desert country to a highway in southern Arizona. Based on footprints which had been discovered, the officers estimated a rendezvous point where the aliens would meet someone whom the officers had dubbed "Chevron" because of a distinctive footprint found on a recurring basis. Based on their observations, the officers concluded that on one particular evening, it was likely that "Chevron" would be escorting a group of aliens to a rendezvous with a vehicle at the highway. The border patrol officers posted themselves an hour and a half east of where they suspected the rendezvous point would be, and looked for vehicles large enough to transport a group of illegal aliens. As they suspected would happen, the officers observed a pickup truck with a camper shell pass by their observation point and return almost exactly an hour and a half later. The officers intercepted the vehicle and questioned the driver and passenger. It was determined that the passenger was wearing shoes with soles matching the distinctive "Chevron" shoe-print. Subsequent investigation revealed the presence of six illegal aliens in the camper.
The Supreme Court found that the facts and circumstances as known to the border patrol officers at the time that they observed the camper were sufficient to provide articulable and founded suspicion that the camper was involved in the transportation of illegal aliens. In doing so, the Supreme Court emphasized that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." 101 S.Ct. at 696. There is an analogy to be drawn here between the characteristics upon which trained border patrol officers support their suspicions that vehicles are transporting illegal aliens and those characteristics upon which trained highway patrol officers support their suspicions that vehicles are transporting illegal drugs over the highways of this state. Certainly the governmental interests in interdicting the flow of illegal drugs is at least as great as the governmental interest in intercepting the transport of illegal aliens.
The profile involved here and in Forfeiture of $6,003.00 was developed by Trooper Vogel, based on his experience with drug traffickers. Over the years as a highway patrolman, Trooper Vogel kept a list of narcotics arrests he made in the course of his duties. It is true that alone none of the factors cited by the trooper as being part of the profile would provide a founded suspicion to justify the stop of a moving vehicle for further investigation. However, inherent in the nature of profiles is that no single factor provides a reasonable suspicion of criminal activity, but that the presence of enough of the factors, though each one may be innocent in itself, is sufficient to make a trained observer reasonably suspicious.[7] If any factor alone was sufficient to provide reasonable suspicion then there would be no need for a profile or compilation of factors. The trooper used identifiable profiles that contained specific elements. These elements accurately identified drug traffickers as shown by the success rate of the profile.[8]
A frequent objection to the use of such a profile is that the factors comprising *1021 the profile are also consistent with behavior that is perfectly innocent. See Florida v. Royer, 103 S.Ct. at 1332 (Brennan, J., concurring). This alone however is not a valid objection. A founded suspicion consists of "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [detention]." Terry v. Ohio, 88 S.Ct. at 1880. Thus, the police officer's suspicions need not be inconsistent with a hypothesis of innocence. Rather, they need to be based only on rational inferences, from articulable facts, which reasonably suggest criminal activity. In Horvitz, supra, Judge Hersey noted:
The point is that innumerable law enforcement officers, through personal experience, have observed that, while couriers do things that innocent, honest travelers do  such as pay in cash, drug couriers also tend to do things that innocent, honest travellers do not ordinarily do  such as travel under an assumed name. Is it either logically reasonable or philosophically justifiable for a judge or several judges to conclude that a combination of such observable factors are "clearly not sufficient to provide the reasonable suspicion of criminal activity necessary to justify ... a seizure. See Royer, [460] U.S. [512], 103 S.Ct. at 1332 (Brennan, J., concurring). I suggest not. I suggest, instead, that a sufficient (at least undetermined) correlation between the activities of the traveller and the drug courier profile should be considered reasonable suspicion for a stop and search.
Horvitz, 433 So.2d at 548 (Hersey, J., concurring). We find Judge Hersey's reasoning persuasive as applied to the facts of the instant case. Here, Vogel articulated numerous facts which, in light of his extensive experience, rationally suggested the defendant's involvement in drug trafficking. As the Supreme Court recognized in Terry v. Ohio, the role of the courts in enforcing Fourth Amendment protections is to review the conduct of law enforcement officials against objective standards. 88 S.Ct. at 1880. However, the Supreme Court has also instructed that in evaluating police conduct, the courts must always give due weight to the specialized expertise and experience of the law enforcement officer. Thus, while the standard of reasonableness is never a subjective one, the courts must view the conduct through the eyes of the police officer, as he would see it. Cortez, supra. The State argues that the drug courier profile in this case, developed and relied upon by Trooper Vogel in investigating drug trafficking on the interstate highways, is sufficient to provide reasonable suspicion justifying a brief investigatory traffic stop. This court rejected that argument in In re: Forfeiture of $6,003.00. However, in the light of the discussion here, and because of the great governmental interest in stemming the flow of illegal drugs, we certify the following question to the Supreme Court of Florida as one of great public importance:
MAY A PROFILE OF SIMILARITIES OF DRUG COURIERS, WHICH IS DEVELOPED BY A LAW ENFORCEMENT OFFICER AND WHICH, IN LIGHT OF HIS EXPERIENCE, SUGGESTS THE LIKELIHOOD OF DRUG TRAFFICKING, BE RELIED UPON BY HIM TO FORM AN ARTICULABLE OR FOUNDED SUSPICION WHICH WILL JUSTIFY A BRIEF INVESTIGATORY TRAFFIC STOP ON HIGHWAYS KNOWN TO THE OFFICER TO BE FREQUENTLY USED FOR THE TRANSPORT OF DRUGS?
AFFIRMED; QUESTION CERTIFIED.
ORFINGER, and SHARP, JJ., concur.
DAUKSCH, J., concurs in conclusion only.
NOTES
[1] See Kellner, The National Strategy  An Overview, 11 Nova L.Rev. 933 (1987) ("South Florida is the point of entry for more than 80 percent of the marijuana and cocaine imported into the United States from South America and the Caribbean.") Drug trafficking through Florida is so notorious that having Florida license plates on a vehicle is a profile factor in at least two out-of-state drug courier profiles. See State v. Cohen, 711 P.2d 3 (N.M. 1985); Cloud, Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas, 65 B.U.L.Rev. 843, 854 n. 47 (1985). (In Georgia, the DEA has trained 80 state highway troopers to use a "highway drug courier profile" as part of a program called "Operation Pipeline" which focuses particular attention on cars coming from Florida).
[2] The plurality and dissenting opinions in Royer both endorsed the use of drug courier profile characteristics as a basis for articulable suspicion. Only Justice Brennan expressed disapproval of the profile. 103 S.Ct. at 1332 (Brennan, J., concurring).
[3] These profile factors were: two men in the car with out-of-state plates; they appeared to be foreigners; they were on a cross-country trip in a one way car rental paid for by cash from an area suspected by authorities to be a point of origin in drug shipments; that they appeared more nervous than the average person stopped for speeding: that they appeared to want to get away from the officer as quickly as possible. State v. Cohen, 103 N.M. 558, 711 P.2d 3 (N.M. 1985).
[4] In Jacobson v. State, 476 So.2d 1282 (Fla. 1985), the supreme court observed that "Reid v. Georgia has established the principle that similarities between a suspect and a `drug courier profile' are insufficient to establish the requisite reasonable and articulate suspicion." 476 So.2d at 1282. We find these statements however to be dicta, because the court held that the meeting between the defendant and the law enforcement officers was not a seizure, but only a mere encounter. Thus, it was not necessary for the court to determine whether the drug courier profile justified the stop. In any case, the decision predated Royer. Additionally, as the court observed in that case, the profile characteristics were less compelling than those in Reid.
[5] The Florida Highway Patrol also has issued a guideline sheet indentifying drug courier characteristics that includes other factors including (1) air shocks; (2) blacked out glass; (3) heavily loaded vehicles. However, Vogel testified that he did not rely on the FHP guideline sheet in this particular case.
[6] "`[T]he key principle of the Fourth Amendment is reasonableness  the balancing of competing interests.'" Michigan v. Summers, 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 2593, n. 12, 69 L.Ed.2d 340 (1981), quoting Dunaway v. New York, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (White, J., concurring).
[7] "Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation." United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 1573 at n. 3, 84 L.Ed.2d 605 (1985). Also, in Terry, the Court observed that the officer had "observed [the defendants] go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." 88 S.Ct. at 1880-81 (Emphasis added).
[8] Over a nine-night period the trooper made 15 to 20 stops, resulting in 7 arrests.