561 So.2d 1139 (1990)
STATE of Florida, Petitioner,
v.
Paul Clive JOHNSON, Respondent.
No. 71631.
Supreme Court of Florida.
May 10, 1990.
*1140 Robert A. Butterworth, Atty. Gen., Ellen D. Phillips and Walter M. Meginniss, Asst. Attys. Gen., Tallahassee, for petitioner.
Carl H. Lida of the Law Offices of Carl H. Lida, P.A., Miami, for respondent.
Enoch J. Whitney, General Counsel, and R.W. Evans, Asst. General Counsel, Tallahassee, amicus curiae for Dept. of Highway Safety and Motor Vehicles.
Richard Lubin, West Palm Beach, and Nancy Hollander of Freedman, Boyd & Daniels, P.A., Albuquerque, N.M., amicus curiae for Nat. Ass'n of Criminal Defense Lawyers.
Arthur Joel Berger, Miami, amicus curiae for Florida Ass'n of Criminal Defense Lawyers, Miami Chapter.
BARKETT, Justice.
We have for review State v. Johnson, 516 So.2d 1015 (Fla. 5th DCA 1987), which certified the following question of great public importance:
May a profile of similarities of drug couriers, which is developed by a law enforcement officer and which, in light of his experience, suggests the likelihood of drug trafficking, be relied upon by him to form an articulable or founded suspicion which will justify a brief investigatory traffic stop on highways known to the officer to be frequently used for the transport of drugs?
Id. at 1021.[1] As it relates to the facts here, we answer the question in the negative.
On June 4, 1985, Florida Highway Patrol Trooper Robert Vogel was assigned to a special drug detail working on Interstate 95 in Volusia County. At about 4:15 a.m., he spotted a large luxury car driving north, bearing Maryland license plates and traveling at exactly 55 m.p.h., the legal speed limit.
Vogel decided to make an "investigatory" stop because the following facts fit a personal drug courier profile Vogel had developed: (1) the car was driving at 4:15 a.m.; (2) the driver was alone; (3) the driver was about thirty years of age; (4) the car had out-of-state tags; (5) the car was of a large model type; (6) the driver was male; (7) the driver was wearing casual clothes; (8) the driver was being "overly cautious" by driving at precisely the speed limit; (9) the car was driving on a known drug corridor, Interstate 95. Based solely on these factors, Vogel stopped and detained Johnson. After making the stop, Vogel discovered marijuana in the trunk of the vehicle, seized it, and arrested Johnson.
At trial, Vogel testified that he had thirteen and one-half years' experience in identifying and arresting persons transporting illegal drugs. Between March 5, 1984, and April 18, 1985, Vogel compiled his own drug courier profile based on elements common to each of thirty arrests made during this period.[2] However, he testified *1141 that he does not keep records of all the vehicles that fit the "profile" which he stops and does not search, or stops and searches but finds no contraband. Testimony at trial indicated that the Florida Highway Patrol had its own drug courier profile, which included the presence of air shocks on a car, blacked-out glass and evidence the vehicle was heavily loaded. However, Vogel testified he did not rely on the Patrol's profile.
Based on these facts, the trial court suppressed the evidence seized from the vehicle. The trial judge concluded that the factors given by Vogel did not constitute founded suspicion that Johnson had engaged in criminal conduct.
On appeal, the Fifth District agreed based partly on its prior rejection of Vogel's profile in In re Forfeiture of $6,003.00, 505 So.2d 668 (Fla. 5th DCA), review denied, 511 So.2d 998 (Fla.), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). It found that the factors given by Vogel in their totality did not create founded suspicion of criminal activity.
The state's sole basis for supporting the validity of the stop is Vogel's personal profile. Thus, the question presented is whether a late model out-of-state car driven by a thirty-year-old male at 4:15 in the morning, in accordance with all traffic laws and regulations, gives rise to founded suspicion of criminal conduct. We find that it does not.
Indeed, this conclusion is supported by at least three other cases that have considered similar "profiles" used by this same officer, Trooper Vogel, in other similar automobile stops. In the case of In re Forfeiture of $6,003.00, 505 So.2d at 669, the Fifth District concluded that Trooper Vogel's profile was "too general and unparticularized." It reached this conclusion based on a profile consisting of factors similar to those at bar, which differed only in that the stopped automobile bore Florida rental tags and had two occupants.
Previously, the Eleventh Circuit Court of Appeals had occasion to review Trooper Vogel's profile. In United States v. Smith, 799 F.2d 704, 707 (11th Cir.1986), the court condemned Vogel's profile as "a classic example of those `inarticulate hunches' that are insufficient to justify a seizure under the fourth amendment." Indeed, the Eleventh Circuit termed Trooper Vogel's list of factors as nothing but "nondistinguishing characteristics." Id. In the context of Smith, these characteristics consisted of out-of-state car tags on a car traveling fifty miles per hour, containing two occupants, with a driver about thirty years of age who appeared to be overly cautious.
Trooper Vogel's profile again came before the federal bench in United States v. Miller, 821 F.2d 546 (11th Cir.1987), and again was rejected. In Miller, the Eleventh Circuit made a telling comment:
In this case, Trooper Vogel pulled over at 9:40 at night a car that was obeying the speed limit, that was being driven cautiously, and that was from out-of-state. During the Florida tourist season, that description likely describes a high percentage of cars on Interstate 95... . The record does not reveal how many unsuccessful searches Trooper Vogel has conducted or how many innocent travelers the officer has detained. Common sense suggests that those numbers may be significant.
Id. at 550.
We agree with these observations, and find that they apply equally to the instant case. Accordingly, we conclude that article I, section 12 of the Florida Constitution,[3] *1142 prohibits the police conduct that occurred in this instance.
We have little doubt that individual police officers may exercise a degree of discretion in choosing to make a stop after observing a situation indicating a likelihood of criminal wrongdoing. A "profile" thus is permissible precisely to the degree that it reasonably describes behavior likely to indicate crime. That is, the officer, prior to the stop, must observe some activity that links a particular person to some specific, articulable evidence of criminal wrongdoing. See Ybarra v. Illinois, 444 U.S. 85, 92-93, 100 S.Ct. 338, 342-43, 62 L.Ed.2d 238 (1979). However, Florida law does not permit a profile based on factors that are little more than mundane or unremarkable descriptions of everyday law-abiding activities.
We are mindful of the concerns raised in Chief Justice Ehrlich's dissent. However, we find that the authority on which he relies, even if applied to this case, would fully support our views. For instance, in United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court held that founded suspicion of an immigration law violation cannot be based solely on the fact that the occupants of a car appear to be Mexican. Id. at 876, 95 S.Ct. at 2577. In that context, the Court went on to say that it was unwilling to "dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops" even in the context of a search for illegal aliens. Id. at 882, 95 S.Ct. at 2580. The Court stated:
Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.
Id. at 884, 95 S.Ct. at 2581 (emphasis added). The fact that a person appears to be Mexican does not support a rational inference that the person is an illegal alien. Id. at 876, 95 S.Ct. at 2577.
If this standard applies to federal efforts to detect illegal aliens, then the same standard at the very least applies to roving stops of state citizens by state police, such as occurred in the present case. And in that regard, we cannot agree that the characteristics constituting Trooper Vogel's profile support a "rational inference" of criminal wrongdoing. Indeed, we find that the United States Supreme Court's recent decision in United States v. Sokolow, ___ U.S. ___, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), upon which the dissent relies, would support the same conclusion even if the instant case did not implicate state constitutional concerns. Unlike the inadequate "profile" in Brignoni-Ponce and the present case, the facts in Sokolow unmistakably support a rational inference of wrongdoing.
In Sokolow, the United States Supreme Court upheld an airport search based on a profile when the defendant (1) had bought two airline tickets totalling $2,100 using twenty-dollar bills that he peeled from a much larger roll of cash; (2) had traveled under an assumed name; (3) had traveled to Miami, a city that is a common source of illicit drugs; (4) had planned to stay in Miami only about twenty-eight hours; (5) had appeared nervous throughout his trip; and (6) had checked no luggage. Id. 109 S.Ct. at 1583. Thus, the profile in Sokolow justified a stop precisely because it described unusual conduct that set the defendant apart from other travelers and that strongly suggested concealed criminal conduct. See id. at 1586 (defendant's behavior was "out of the ordinary").
In the present case, there was nothing at all unusual or out of the ordinary about the *1143 conduct that constituted Trooper Vogel's "profile." It described conduct that was entirely unremarkable and completely lawful, just as the appearance of being Mexican was unremarkable and completely lawful in Brignoni-Ponce. The elements of Trooper Vogel's profile do not suggest concealed criminal conduct, as did the facts in Sokolow. Men of a certain age who drive certain kinds of cars in the evening hours, traveling at or below the speed limit on interstate corridors, simply cannot be described as an inherently "suspicious" bunch.
Indeed, the class of persons described by Trooper Vogel's profile is enormous. This profile literally would permit police to stop tens of thousands of law-abiding tourists, businessmen or commuters, just as the "profile" in Brignoni-Ponce would have authorized unrestrained stops of law-abiding Mexican-Americans. The resulting intrusion upon the privacy rights of the innocent is too great for a democratic society to bear. Were we to approve this profile, we might just as well approve a profile based on racial or ethnic characteristics, religious background, sex or any other completely innocent trait.
By contrast, the profile used in Sokolow manifestly would apply to only a few individuals who exhibit highly suspicious behavior in making airline travel arrangements. The intrusion upon privacy rights of the innocent in Sokolow is likely to be minimal. We thus cannot equate the Sokolow profile with that of Trooper Vogel, nor can we say that any of the other case law cited in the dissent would support a result contrary to the one we reach. The Sokolow profile is closely tailored to rationally describe concealed criminal conduct, whereas the profiles in Brignoni-Ponce and in the present case are not.
Finally, we do not agree with Justice Ehrlich's assessment that our opinion limits law enforcement to stopping only those who have violated traffic laws. Nor are we requiring a level of suspicion equal to probable cause in vehicle-stop cases. To the contrary, we find that even a sequence of lawful acts not rising to the level of probable cause may, in appropriate circumstances, so strongly suggest concealed criminal conduct as to justify a stop, as was the case in Sokolow. What we require today is that there must be a strong and articulable link  a "rational inference"  between the sequence of acts observed by the police and the concealed criminal conduct believed to exist, whether or not this sequence is described as a "profile." Such a link simply does not exist in the record before us.
The opinion of the district court below is approved.
It is so ordered.
OVERTON, SHAW, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., dissents with an opinion.
McDONALD, J., dissents with an opinion, in which EHRLICH, C.J., concurs.
EHRLICH, Chief Justice, dissenting.
I must respectfully dissent.
The fourth amendment to the United States Constitution, and article I, section 12, of the Florida Constitution, only prohibit unreasonable searches and seizures. In order to determine what is reasonable, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). See also United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The governmental interest in combatting the drug problem is very strong. See National Treasury Employees Union v. Von Raab, ___ U.S. ___, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Florida v. Royer, 460 U.S. 491, 508, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (Powell, J., concurring); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Balanced against that interest is the minimal intrusion occasioned by a brief investigatory *1144 stop. Brignoni-Ponce, 422 U.S. at 881, 95 S.Ct. at 2580. Another element considered by the Court in Brignoni-Ponce is the "absence of practical alternatives." 422 U.S. at 881, 95 S.Ct. at 2580. It is against this backdrop that we are to determine whether Trooper Vogel had reasonable suspicion in this case.
As the United States Supreme Court recently stated in United States v. Sokolow, ___ U.S. ___, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a `profile' does not somehow detract from their evidentiary significance as seen by a trained agent." The question in this case, therefore, should not be whether the profile itself may be relied on, but whether the factors used by Trooper Vogel in this case were sufficient to give rise to a reasonable suspicion. I would answer that question in the affirmative.
This involves looking at "`the totality of the circumstances  the whole picture,'" and this "`process does not deal with hard certainties, but with probabilities.'" United States v. Sokolow, 109 S.Ct. at 1585 (quoting United States v. Cortez, 449 U.S. 411, 417, 418, 101 S.Ct. 690, 694, 695, 66 L.Ed.2d 621 (1981)). The majority states that "the officer, prior to the stop, must observe some activity that links a particular person to some specific, articulable evidence of criminal wrongdoing." Op. at 1141. This is contrary to Sokolow, where the Court reemphasized that none of the particular factors observed must be evidence of ongoing criminal behavior. "`[T]he relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts'" 109 S.Ct. at 1587 (quoting Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)). Indeed, perfectly lawful conduct, under the right conditions, might support a reasonable suspicion of criminal activity. Id. However, an "inchoate and unparticularized suspicion or `hunch,'" Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968), is not a sufficient basis for reasonable suspicion. The majority requires a level of suspicion equal to probable cause. The Court in Sokolow, however, noted that "probable cause means `a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause." 109 S.Ct. at 1585 (quoting Gates, 462 U.S. at 238, 103 S.Ct. at 2332). The Fifth District Court below is correct that
[t]he difficulty ... is due, in part, to the indefiniteness and malleability of the "reasonable suspicion" standard, and the apparent willingness on the part of some courts to elevate it to a level which approaches, if it does not in fact reach, the standard of "probable cause." "Suspicion" implies a belief or opinion based on facts and circumstances which do not amount to proof; the apprehension of some fact upon slight evidence. Black's Law Dictionary, Fifth Edition, p. 1298. Obviously, suspicion does not equal probable cause.
State v. Johnson, 516 So.2d 1015, 1019 (Fla. 5th DCA 1987).
I believe that the facts articulated by Trooper Vogel are sufficient to create a reasonable suspicion. In Brignoni-Ponce, a case involving a stop to search for illegal aliens, factors very similar to those used by Trooper Vogel were approved by the United States Supreme Court for consideration when deciding whether reasonable suspicion exists. Those factors included: "the characteristics of the area in which they encounter a vehicle," "[i]ts proximity to the border, the usual patterns of traffic on the particular road," "previous experience with alien traffic," the "driver's behavior ... [such] as erratic driving or obvious attempts to evade officers," and "[a]spects of the vehicle itself... [known to be] frequently used for transporting concealed aliens." 422 U.S. at 884-85, 95 S.Ct. at 2581-82. See also Cortez, 449 U.S. at 419-20, 101 S.Ct. at 695-96. It is important to recognize that such evidence

*1145 must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
... .
... [W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion.
Id. at 418-19, 101 S.Ct. at 695. The district court below is correct that
[t]here is an analogy to be drawn here between the characteristics upon which trained border patrol officers support their suspicions that vehicles are transporting illegal aliens and those characteristics upon which trained highway patrol officers support their suspicions that vehicles are transporting illegal drugs over the highways of this state. Certainly the governmental interests in interdicting the flow of illegal drugs is at least as great as the governmental interest in intercepting the transport of illegal aliens.
Johnson, 516 So.2d at 1020.
There are several factors used by Trooper Vogel, however, which I believe are inappropriate. These factors relate to nondistinguishing personal physical characteristics such as gender, age, and dress, which describe a class of people rather than the specific conduct of a particular individual. Reliance on such characteristics increases the likelihood of the kind of "overbearing or harassing" police conduct prohibited by the fourth amendment. See Terry, 392 U.S. at 14-15, 88 S.Ct. at 1876. By contrast, the factors in Sokolow all involved particularized conduct by the defendant.[1] Although the Court in Brignoni-Ponce did refer to the officers' ability to recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut, 422 U.S. at 885, 95 S.Ct. at 2582, such evidence is more relevant to situations in which the "contraband" sought to be intercepted is the illegal alien himself. However, such evidence is not particularly probative of whether a person is smuggling drugs.
Even without the improper factors, I am of the opinion that the evidence is sufficient to support reasonable suspicion. In my view, prohibiting the use of factors such as those articulated in this case as a basis for reasonable suspicion justifying a brief investigatory stop would severely limit the government's ability to stem the tremendous flow of drugs through this state. Smugglers would be aware that, for all practical purposes, as long as they obey all traffic laws they can never be stopped.[2]
The reasoning of the district court below is sound. That court, however, felt bound by its prior decision in In re Forfeiture of $6,003.00, 505 So.2d 668 (Fla. 5th DCA), review denied, 511 So.2d 998 (Fla.), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). I agree with the district court below that Trooper Vogel had reasonable suspicion to stop Johnson's car, as that standard has been interpreted by the United States Supreme Court in construing the fourth amendment to the United States Constitution. Because the search and seizure provision of the Florida Constitution, article I, section 12, must be construed in conformity with the United States Supreme Court construction of the fourth amendment, I would quash the opinion of the court below.
McDONALD, Justice, dissenting.
I would answer the certified question in the affirmative. Vogel's profile, which included *1146 an accumulation of factors, was reasonable; reasonable profile stops of an automobile on a state highway should be contemplated by users of the highway, whose expectation of privacy should be considerably less than normal under the circumstances existing in this case.
We have a huge drug problem in Florida, particularly in South Florida, a major distribution center of drugs. It is known that I-95 and the Florida Turnpike are major avenues for this distribution. Vogel is a trained police officer and evidence in the instant case established that one-third to one-half of his vehicle stops resulted in major drug arrests. Thus it cannot be said that he is indiscriminate in his arrests. The stops themselves are relatively unobtrusive and short in duration. Balancing the interests of the state against the minimal intrusion of motorists who should anticipate some occasional stops for one reason or another, I conclude that the stop was reasonable and violated neither Florida nor United States constitutional provisions.
EHRLICH, C.J., concurs.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
[2] These characteristics were:

(1) Day of the week.
(2) Time of day.
(3) Type of vehicle.
(4) Year of vehicle.
(5) Whether the vehicle had two or four doors.
(6) The license tag.
(7) The presence of CB or radar detectors.
(8) The number of occupants in the car.
(9) The age group of the occupants.
(10) The destination of the vehicle.
[3] Article I, section 12, provides:

Searches and seizures.  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.
[1] Sokolow: (1) paid for expensive plane tickets in cash of small denominations; (2) travelled under an alias; (3) travelled from Miami, a known source city for drugs; (4) travelled from Hawaii to Miami but only stayed a short time in Miami; (5) appeared nervous; (6) did not check his luggage. United States v. Sokolow, ___ U.S. ___, 109 S.Ct. 1581, 1584, 104 L.Ed.2d 1 (1989). See also Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (conduct suggested to officer that defendant and his associates were casing a store for a robbery).
[2] The only alternative I can see is a roadblock check, which is probably impractical to use on a regular basis on such a well-travelled highway.