DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LU JING,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D21-147

[April 28, 2021]

Appeal from the County Court for the Fifteenth Judicial Circuit, Palm Beach County; Mark T. Eissey, Judge; L.T. Case Nos. 502019MM013707A and 502020AP000023.

Carey Haughwout, Public Defender, and Benjamin Eisenberg, Assistant Public Defender, West Palm Beach, for appellant.

David Aronberg, State Attorney, and Joseph R. Kadis, Assistant State Attorney, West Palm Beach, for appellee.

GROSS, J.

Lu Jing appeals her conviction for resisting an officer without violence. We reverse the conviction because a Florida statute precluded law enforcement from arresting Appellant for a misdemeanor that did not occur in the presence of a law enforcement officer. During an investigative stop, law enforcement officers effected an arrest by handcuffing Appellant for transport to the station house for further questioning. This conduct exceeded the lawful bounds of the investigative stop, so the State failed to establish a necessary element of resisting an officer without violence.

### *Introduction*

The State charged Appellant Lu Jing by information with two misdemeanor offenses: (I) trespassing after receiving a warning and (II) resisting an officer without violence. Count I alleged that Appellant trespassed upon Mar-a-Lago, a private club located in Palm Beach, Florida.

Count II of the information provided:

> [Appellant] on or about December 18, 2019, in the County of Palm Beach and State of Florida, did resist, obstruct or oppose TAYLOR MOLINARO a law enforcement officer of the PALM BEACH POLICE DEPARTMENT in the execution of a legal process or in the lawful execution of a legal duty, without offering or doing violence to the person of such officer, contrary to Florida Statute 843.02 (1 DEG MISD)

Following a jury trial, Appellant was acquitted of trespassing but found guilty of resisting an officer without violence.

The issue we address in this appeal is the sufficiency of the evidence to support the conviction for resisting an officer without violence.

### *The Evidence at Trial*

On a Wednesday afternoon in December 2019, at around 12:30 p.m., a security officer for the Mar-a-Lago Club observed Appellant taking pictures while walking on the club's main driveway. Mar-a-Lago is considered a national historical landmark and is also a private club open only to members and pre-arranged guests.

The security officer approached Appellant and told her to leave the property because she was in a "no trespassing" area. It became apparent to the security officer that Appellant—who is of Asian descent—did not speak English. Therefore, the security officer used hand gestures and pointed towards the road to communicate to Appellant that she needed to leave. In response, Appellant walked north onto Ocean Avenue.

A short time later, the security guard saw Appellant on the Mar-a-Lago premises again, this time on the exit driveway. He tried to tell Appellant that she was on private property and gestured for her to leave. Appellant then left the property and did not return.

Two Palm Beach police officers—Sergeant Michael Dawson and Officer Taylor Molinaro—responded to Mar-a-Lago after the trespassing incident was reported to law enforcement. Neither officer saw Appellant on the Mar-a-Lago property nor did they see her interact with the security officer. The Mar-a-Lago security director told Officer Molinaro what had happened and showed the officer surveillance video as well as photographs.

At about 1:00 p.m. that same Wednesday, Sergeant Dawson saw Appellant standing on the corner of Worth Avenue and South County Road, about two miles north of Mar-a-Lago. Sergeant Dawson tried to talk with Appellant, but she appeared unable to speak English. At the time, Sergeant Dawson was the only officer at the scene. He did not request an interpreter. Nor did he attempt to use his cellphone to translate because he was not technically proficient with the translation application and did not know the language Appellant spoke.

Instead, Sergeant Dawson used hand gestures to convey that he wanted to talk. He could not say whether Appellant understood why he was talking to her, but she was cooperative and did not seem scared. Appellant handed him her passport and her cell phone. Sergeant Dawson gave her cellphone back.

Within five minutes, Officer Molinaro arrived wearing a police uniform with a visible badge. Recognizing that Appellant did not speak English, Officer Molinaro used hand motions in an attempt to lead her towards his patrol car "[b]ecause at that point [they we]re arresting her." Officer Molinaro affirmed at trial that "[i]t is a duty of [his] as an officer to arrest individuals . . . [w]ho have committed crimes." Officer Molinaro also testified he was investigating the trespassing incident and wanted to talk with Appellant.

Because of the language barrier, Officer Molinaro could not say with certainty that Appellant understood why he was motioning her to the police vehicle. Appellant did not move. Eventually, Officer Molinaro took out his handcuffs and began walking towards her. Appellant's response was to "back[] up [and] put her hands across her chest." Officer Molinaro described these events for the jury:

> . . . I was using the hand motions and trying to talk to her and motion her to my car. [A]t that point she was just standing there. It didn't seem like she, she, um, understood what I was saying, so I kept on motioning her. And then we came to the point *where we had to take her from that scene* and, um, bring her to a spot where we can communicate with her, and that was by taking out my handcuffs like this.

(Emphasis supplied). At that point in the encounter, Defendant crossed her arms in front of her chest, balled her hands into fists, took a few steps backward and yelled "no, no, no."

3

Officer Molinaro gave Appellant "a few seconds to put her hands behind her back." He then took a step forward. . . . When Appellant continued not to comply with his attempts to get her to "cooperate in his investigation," Officer Molinaro successfully placed her under arrest, even though she continued to resist his efforts "[b]y not freeing her arms," "pushing backwards, and holding, clenching her hands tight against her body." Officer Molinaro did this by using a "soft-hand technique" to grab Defendant's balled-up fist and place it behind her back to put the handcuffs on her.

At the close of the State's case, defense counsel moved for judgment of acquittal on both charges, which the county court denied.[1]

### *The Defense's Case*

Through a Mandarin translator, Appellant testified on her own behalf.

On the Wednesday in question, she went to Mar-a-Lago as part of a private tour led by a Chinese tour guide she hired online for $200 per day. The tour began that day in Miami at 8:30 a.m. Appellant conversed with the tour guide in Mandarin. Other than a few simple words such as "no," "bye," and "thank you," Appellant could not speak English.

There was no public parking area at the Mar-a-Lago Club, so the tour guide dropped Appellant off in front of the property. The tour guide did not tell her that Mar-a-Lago was private property, other than to say it was President Donald Trump's estate. The gate to the club was open and Appellant did not see any signs indicating she could not take pictures of the premises. She walked by the gate area and took pictures from her cellphone.

After Appellant had taken pictures, a security officer waved at her and spoke to her in English. During the interaction, the security officer used

---

[1] Defense counsel adequately preserved the argument that Appellant's arrest was not authorized under section 901.15, Florida Statutes (2019). Counsel referenced the "misdemeanor presence rule" to argue that the State failed "to prove that all of the elements of trespass took place in front of the officer" so as to justify a warrantless arrest. The trial court understood the legal argument because it questioned the State on this issue. *Contra H.R. v. State,* 298 So. 3d 1217, 1220 (Fla. 3rd DCA 2020) (writing that "[h]ad H.R.'s counsel, in moving for a judgment of dismissal, argued that the arrest was unlawful because the underlying misdemeanor had not been committed in the officer's presence, the issue would have been properly preserved and it would have been reversible error for the court to deny that motion").

gestures that made Appellant feel "that he didn't want [her] to be here, so [she] left."

Appellant walked along a road that she believed she was permitted to use. She resumed taking pictures, but a person approached her and tried to tell her something in English. The person gestured towards Appellant as if he wanted her to enter a vehicle, which scared her. Appellant said, "No English, sorry," before walking away and calling the tour guide.

The tour guide picked Appellant up in his car and they drove around the area, eventually stopping at Worth Avenue. There, Appellant got out of the car while the tour guide looked for a parking spot. As Appellant walked towards a clothing store, a police officer stopped his vehicle nearby. The officer approached and spoke to her in English, but she did not understand what he was saying.

After gesturing for Appellant to stand alongside the street, the officer showed her a picture on his cellphone of Appellant leaning against a wall. Appellant could not communicate with the officer, but she "figured that he didn't want [her] to take . . . picture[s]." Appellant took out her phone and tried to tell the officer that she did not do anything other than take pictures and that she would be willing to delete the pictures. Appellant then deleted a picture, but the officer physically took her phone away. Appellant also handed the officer her passport.

Eventually, a second police officer arrived at the scene. After speaking with the first officer, the second officer took out handcuffs and tried to grab Appellant's hands. Appellant became "very scared" since she did not know what she had done wrong. Appellant took a step back, crossed her arms, and tried to say that she had only taken pictures. Appellant described her reaction as "normal" since she "didn't know why [the officer] wanted to arrest" her.

### Defense Motion and Verdict

Defense counsel renewed the motion for judgment of acquittal. The trial court asked the State "about the issue of the trespass not occurring in the officer's presence." The prosecutor responded that "even if [the court] were to find that because the trespass didn't occur in the presence of the officer, that it was a warrantless arrest, the only thing that would arise from that is that everything after the arrest would be lost, we wouldn't talk about it." Plainly, the prosecutor understood the issue as involving the suppression of evidence under the Fourth Amendment, rather than one going to an essential element of the resisting charge.

The jury acquitted Appellant of the trespassing charge, but convicted her of resisting an officer without violence. This appeal ensued.

### *Because Officer Molinaro Was Not Authorized by Florida Law to Handcuff Appellant and Take Her into Custody, He Was Not Acting in the Lawful Execution of a Legal Duty, a Necessary Element of Resisting an Officer Without Violence*

Standing on Worth Avenue, at 1:00 in the afternoon, Appellant was not fighting or arguing with police officers or otherwise causing a disturbance. Worth Avenue, in the heart of Palm Beach, is hardly a high-crime area. She was unarmed. She posed no threat to the physical safety of the officers. She did not try to flee. When Officer Molinaro approached Appellant, handcuffs in hand, he was speaking a universal language that Appellant well understood—she was about to be arrested. Handcuffing Appellant to place her in a patrol car and transport her to the station house for further questioning elevated an investigatory stop into an arrest. Well-established Florida law precluded him from making an arrest under these circumstances, so Appellant was entitled to resist being handcuffed without force. This she did by crossing her hands against her chest. She did not strike the officer or otherwise offer to do violence. Therefore, her conduct did not contravene the resisting an officer without violence statute.

Two Florida Statutes come into play in this case.

First, Appellant was convicted under section 843.02, Florida Statutes (2019), which defines the misdemeanor of resisting an officer without violence as requiring proof that the defendant did "resist, obstruct, or oppose any officer" in "the lawful execution of any legal duty, without offering or doing violence to the person of the officer." To prove the offense of resisting an officer without violence, the State had to present evidence: (1) that Officer Molinaro was engaged in the lawful execution of a legal duty and (2) that Appellant's actions constituted obstruction or resistance of that duty. *See A.W. v. State*, 82 So. 3d 1136, 1138 (Fla. 4th DCA 2012); *Jay v. State*, 731 So. 2d 774, 775 (Fla. 4th DCA 1999).

"[I]t is important to distinguish between a police officer 'in the lawful execution of any legal duty' and a police officer who is merely on the job." *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995). This element of the crime is satisfied when an officer effectuates a legal investigative stop or a lawful arrest. *See E.A.B. v. State,* 851 So. 2d 308, 311 (Fla. 2d DCA 2003). Importantly, "a person retains a right [at common law] to resist an

6

unlawful arrest . . . without force." *Sinquefield v. State*, 1 So. 3d 370, 372 n.2 (Fla. 2d DCA 2009); *see also Lowery v. State*, 356 So. 2d 1325, 1325–26 (Fla. 4th DCA 1978).

The second statute implicated here is section 901.15(1), which provides that, subject to certain statutory exceptions inapplicable to this case, "[a]n officer is authorized to make a warrantless arrest for a misdemeanor only when it is committed in the officer's presence." *Weaver v. State*, 233 So. 3d 501, 503 (Fla. 2d DCA 2017) (quoting *Baymon v. State*, 933 So. 2d 1269, 1270 (Fla. 2d DCA 2006)). To comply with the statute, the "arresting officer must have a substantial reason at the time of [the] warrantless misdemeanor arrest to believe from his observation and evidence at the point of arrest that the person **was then and there** committing a misdemeanor in his presence." *State v. McCormack*, 517 So. 2d 73, 74 (Fla. 3d DCA 1987) (quoting *State v. Yunker,* 402 So. 2d 591, 593 (Fla. 5th DCA 1981)) (emphasis added).

To make a warrantless arrest for a misdemeanor, all elements of the offense must occur in the police officer's presence or have been personally observed by a fellow law enforcement officer. *See Malone v. Howell*, 192 So. 224, 226 (Fla. 1939) ("An arrest without a warrant for a misdemeanor, to be lawful, can only be made where the offense was committed in the presence of the officer -- that is it must have been within the presence or view of the officer in such a manner as to be actually detected by the officer by the use of one of his senses."); *State v. Lord,* 150 So. 3d 260, 262 (Fla. 1st DCA 2014) (explaining the "fellow officer rule" that permits an officer to perform a warrantless arrest for a misdemeanor offense "when the arresting officer has been provided information from a fellow officer sufficient to satisfy" the requirements of section 901.15(1), Florida Statutes).

Section 901.15(1)'s "misdemeanor presence" requirement applies to warrantless arrests for misdemeanor trespass, the charge in this case. *See Smith v. State*, 778 So. 2d 329,330 (Fla. 2d DCA 2000) ("A law enforcement officer may not make a warrantless arrest for a misdemeanor, such as this trespass, unless every element of the crime is committed in his presence."); *Rodriguez v. State*, 29 So. 3d 310, 313 (Fla. 2d DCA 2009) ("Although an officer can arrest a person without a warrant for certain types of misdemeanors where the legislature has authorized a warrantless arrest based on probable cause, this trespass falls within the general rule prohibiting such warrantless arrests.").

In this case, none of the elements for trespassing occurred "in the presence" of Sergeant Dawson or Officer Molinaro within the meaning of

7

the statute. § 901.15(1), Fla. Stat. (2019).  By the time both officers arrived at Mar-a-Lago, Appellant had already left the property.  Neither officer observed Appellant's interactions with the Mar-a-Lago security officer.  Although Officer Molinaro viewed surveillance footage and photographs of the incident, such after-the-fact observations were not sufficient to satisfy the statute's requirement that an arresting officer be present to observe the commission of a misdemeanor as it happens.  When an officer watches a video of a misdemeanor that has been committed earlier, the offense is not "committed . . . in the presence of the officer" as the statute requires.

In the trial court, the State argued that Appellant was actually arrested for loitering and prowling.  However, that crime as well is subject to the arrest limitations imposed by section 901.15(1).

"To establish the crime of loitering and prowling, the State must prove the following two elements: (1) the defendant loitered or prowled 'in a place, at a time, or in a manner not usual for law-abiding individuals,' and (2) the loitering was under 'circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.'" *E.F. v. State*, 110 So. 3d 101, 104 (Fla. 4th DCA 2013).

We have held that "[b]ecause loitering or prowling is a misdemeanor, both elements of the offense must be committed in the officer's presence prior to arrest." *J.M.C. v. State*, 956 So. 2d 1235, 1238 (Fla. 4th DCA 2007) (citing *Grant v. State*, 854 So. 2d 240, 242 (Fla. 4th DCA 2003)); *see also G.G. v. State*, 903 So. 2d 1031, 1033 (Fla. 4th DCA 2005).  "The bottom line is law enforcement must observe the conduct necessary to establish the two elements of loitering and prowling.  First, the officer must observe conduct 'not usual for law-abiding citizens.'  Second, the officer must have 'a justifiable or reasonable alarm or immediate concern' of future criminal activity." *Madge v. State*, 160 So. 3d 86, 89 (Fla. 4th DCA 2015).

Here, Appellant did not commit the elements of loitering and prowling in the presence of Sergeant Dawson or Officer Molinaro prior to Officer Molinaro reaching for his handcuffs.  When encountered by the Palm Beach officers, Appellant was standing on Worth Avenue on a weekday afternoon.  Sergeant Dawson testified that Appellant was calm and cooperative, demonstrated by her handing over her passport and cellphone.  Appellant was not suspected of committing a violent offense, and there was no articulated reason to suspect that she was armed, dangerous, or a flight risk.  Upon this record, Officer Molinaro was not authorized to arrest Appellant without a warrant for loitering and prowling.

The argument that the officers were engaging in the lawful execution of a legal duty by performing an investigative stop is without merit. Handcuffing Appellant and transporting her to the police station fell outside the permissible bounds of an investigative stop. During an investigative stop, a law enforcement officer "'may reasonably detain a citizen temporarily if the officer has reasonable suspicion that a person has committed, is committing, or is about to commit a crime.'" *Caldwell v. State*, 41 So. 3d 188, 195 (Fla. 2010) (quoting *Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993)). Suspected trespass can be the basis for an investigative stop, so the officers were entitled to approach and detain Appellant on Worth Avenue. *See Burgess v. State*, 630 So. 2d 666, 667 (Fla. 4th DCA 1994); *Robinson v. State*, 556 So. 2d 450, 452–53 (Fla. 1st DCA 1990). The State has the "burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

The use of handcuffs will not convert an investigatory stop into an arrest when the use of handcuffs "was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee." *Reynolds v. State*, 592 So. 2d 1082, 1084 (Fla. 1992). But, where "the detained individual is physically removed from the scene and involuntarily transported to the police station for questioning and/or investigation, the courts have had little difficulty in construing such a detention to be a de facto arrest requiring either probable cause or prior judicial authorization." *Saturnino-Boudet v. State*, 682 So. 2d 188, 193 (Fla. 3d DCA 1996).

This case is similar to *Kollmer v. State*, 977 So. 2d 712 (Fla. 1st DCA 2008). There, law enforcement officers—"while conducting [an] otherwise lawful investigatory stop"—"handcuffed [the defendant,] placed him in the police car, and transported him away from the place where he was initially apprehended, presumably for [a witness] to identify him." *Id.* at 715. Although the officer had reasonable suspicion to make an investigatory stop, the First District held that "the officers exceeded the scope of a lawful investigatory stop, in violation of [the defendant's] Fourth and Fourteenth Amendment Rights." *Id.*; *see also M.J. v. State*, 121 So. 3d 1151, 1154 (Fla. 4th DCA 2013) (stating that to "transport an individual for additional questioning, a law enforcement officer must have probable cause for an arrest").

As Appellant argues in her initial brief, she

> provided the officers no indication that handcuffing would be necessary to protect the officers' safety or to thwart an attempt

9

to flee. Sergeant Dawson testified that, prior to Officer Molinaro displaying his handcuffs, Appellant was calm and cooperative. Neither officer testified that they suspected Appellant was armed. Appellant had voluntarily provided Sergeant Dawson her passport, revealing her identity, as well as her cellphone. Finally, Appellant was not suspected of committing a violent crime.

Because section 901.15(1) precluded the officers from arresting Appellant without a warrant, and the handcuffing and transport of Appellant exceeded the scope of a permissible investigative stop, the State failed to show that the officers were engaged in the lawful execution of a legal duty. Appellant was entitled to resist being handcuffed in the non-violent way she did.

We reverse the judgment of conviction for resisting an officer without violence and remand to the Palm Beach County Court for the entry of a judgment of acquittal.

*Reversed.*

LEVINE, C.J., concurs.
ARTAU, J., dissents with opinion.

ARTAU, J., dissenting.

I respectfully dissent because the police officer was engaged in the lawful execution of a legal duty at the time the defendant resisted his authority. Although the officer had not obtained a warrant before his investigatory stop, he did possess reasonable suspicion, if not probable cause, that the defendant had committed a trespass after warning, or alternatively to investigate and potentially effectuate a lawful warrantless arrest of the defendant for loitering or prowling on the private property of Mar-a-Lago, which was the Florida residence of the President of the United States at the time of the events in question.

When reviewing the denial of a motion for judgment of acquittal, "an appellate court must view the evidence in the light most favorable to the State and, maintaining this perspective, ask whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Bush v. State*, 295 So. 3d 179, 200 (Fla. 2020) (internal alterations and quotations omitted); *see also Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002) ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the

elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.").

Rather than viewing the State's evidence in the light *most* favorable to the State as required by our standard of review, the majority primarily relies upon the defendant's evidence and simply assumes that the officer approached the defendant with handcuffs in hand to transport her to the police station for further questioning. The majority relies on that assumption to conclude the officer exceeded the scope of a permissible investigative stop. But that assumption is simply unsupported by the record. Neither of the two officers who were present during the stop testified that the defendant was being handcuffed because they wanted to take her to the police station for further questioning.

Instead, the officers testified that they attempted numerous times to direct defendant to walk over to their patrol car—not the police station— to complete their investigation. The first officer who arrived at the scene testified that the other officer, to whom the defendant ultimately resisted, first attempted "to have her walk to the car, and he used his hands like this, come to the car." In response to a question as to what he did to afford the defendant an opportunity to comply with his investigation before he arrested her for resisting his authority, the officer testified that he "motioned to her to come to the vehicle" several times before taking out his handcuffs to make it clear to her that she was being directed to follow him to his patrol car where he intended to conduct his investigative stop. Thus, one would have to view the State's evidence in the light *least* favorable to the State, contrary to our standard of review, to conclude that the officer did not have the lawful authority to direct her to walk a short distance to his patrol car where he could access the resources available in today's patrol cars to complete his investigation.

Viewing the State's evidence in the light most favorable to the State, it is abundantly clear the State presented sufficient evidence for the jury to convict the defendant of resisting the lawful authority of the officer. When the defendant reentered the "no trespassing" area on the Mar-a-Lago grounds after a security guard warned her to exit the property, she gave the officer a reasonable basis to suspect that she had already committed the offense of trespass after warning. As our sister court explained in *Rodriguez v. State*, 29 So. 3d 310 (Fla. 2nd DCA 2009), while "the misdemeanor had not occurred in his presence and he could not effect an immediate arrest of [the suspect], we conclude that under these circumstances the officer did have authority to conduct a *Terry* stop pursuant to section 901.151, Florida Statutes (2006), to investigate the offense." *Id.* at 311 & n.2 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868,

11

20 L.Ed.2d 889 (1968)).

Section 810.09(1)(a)1., Florida Statutes (2019), prohibits trespassing on property after receiving notice to leave. Just like in this case, the defendant in *Rodriguez* had been warned to leave the property but reentered after she was already on notice to leave by the property's lawful occupants. *See id.* at 311 (describing property occupants' notice to leave and suspect's reentry to property after warning). And just like in this case, the trespass after warning or notice did not occur in the officer's presence. *See id.* ("While the officer was gone, [suspect] had reentered the [property]."). And again, just like in this case, the defendant was arrested for resisting the officer's lawful authority as he was conducting an investigatory stop. *See id.* at 311-12 (suspect resisted by lying to officer after he stopped to investigate "a woman on the sidewalk a few houses down the street who matched her description").

*Rodriguez* acknowledged that "a stop merely to issue a trespass warning is not a *Terry* stop, but rather a consensual encounter." *Id.* at 311 (footnote omitted). *Rodriguez* explained that while a citizen's refusal to comply with an officer during a consensual encounter "would not be an arrestable offense[,]" such a stop would not be a mere consensual encounter if the officer had reasonable suspicion that the owner or occupant first warned or notified the potential trespasser to leave the premises. *Id.* at 311-13 ("[T]here is no question that the officer had reasonable suspicion, if not probable cause, to believe that [the suspect] had trespassed either by refusing to leave the premises after the lessees asked her to leave or by reentering the house without authorization.").

Thus, even though the misdemeanor trespass "occurred outside the presence of the officer" placing it "within the general rule prohibiting such warrantless arrests" as proscribed by section 901.15(1), Florida Statutes (2006), *Rodriguez* concluded "that the officer's inability to effect an immediate, warrantless arrest is not a basis to hold that the officer was prohibited under the Fourth Amendment from conducting an investigatory stop when he had well-founded suspicion that [the suspect] had committed this misdemeanor." *Id.* at 313.

*Rodriguez* reasoned that the Florida Legislature in section 901.151(2), Florida Statutes, made "no distinction between an investigatory stop for a misdemeanor and one for an offense for which a person can be arrested without a warrant," when it expressly authorized an officer to "temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person

had committed, was committing, or was about to commit a criminal offense." *See* § 901.151(2), Fla. Stat. (2019); *see also Rodriguez* 29 So. 3d at 313-14 (quoting § 901.151(2) and concluding that "[n]othing in our case law limits investigatory stops to situations in which the officer has a well-founded suspicion of an offense for which the officer could effect an immediate arrest.").

We have certainly held that "[a] detention for the purpose of issuing a trespass warning on behalf of a private owner—absent other circumstances giving rise to a reasonable suspicion of other criminal activity—is a consensual encounter." *Gestewitz v. State*, 34 So. 3d 832, 834 (Fla. 4th DCA 2010) (citing *Rodriguez*, 29 So. 3d at 310). But in *Gestewitz*, we adopted *Rodriguez*'s holding and explained that a suspect can be legally detained for trespassing if "*the owner or his agent first warned the potential trespasser.*" *Id.* at 834-35 (citing *Rodriguez*, 29 So. 3d at 310) (emphasis added).

Here, the testimony reflects that the police officer responded to a call about a trespasser reentering Mar-a-Lago after she had been notified to leave the property. The Mar-a-Lago security guard advised the defendant that she was not allowed to be on the property and warned her that she needed to leave. Although the defendant initially complied, she was seen again on the property's grounds after reentering through the exit driveway. The security cameras captured her actions and the camera footage was provided to the police as evidence of her illegal reentry onto the property after warning or notice.

Thus, the officer had reasonable suspicion, if not probable cause, in accordance with *Rodriguez*, as adopted by our court in *Gestewitz*, to believe the defendant had trespassed by reentering the property without authorization after the security guard advised her that she was not allowed to be at Mar-a-Lago and warned her to leave the property.

While the officer could not effect an immediate arrest, he was authorized by the express text of section 901.151(2) to temporarily detain her for the purpose of ascertaining her identity and investigating the circumstances surrounding her presence on the property of Mar-a-Lago after being advised to leave and warned not to reenter the property. When the defendant resisted the officer's lawful instruction to walk over to his patrol car to complete his investigation, he had probable cause to arrest her for the offense of resisting an officer without violence.

Alternatively, the officer had reasonable suspicion, if not probable cause, to investigate, and potentially effectuate a lawful warrantless arrest

13

of the defendant for loitering or prowling on the private property of Mar-a-Lago. Section 856.031, Florida Statutes, provides for the warrantless arrest of a suspect who commits the crime of loitering or prowling outside the presence of the arresting officer. It authorizes:

> Any sheriff, police officer, or other law enforcement officer may arrest any suspected loiterer or prowler *without a warrant in case delay in procuring one would probably enable such suspected loiterer or prowler to escape arrest.*

§ 856.031, Fla. Stat. (2019) (emphasis added).

In *J.M.C. v. State*, 956 So. 2d 1235 (Fla. 4th DCA 2007), we recognized that a warrantless arrest for the offense of loitering or prowling is "authorized by section 856.031" in those circumstances where the defendant "would have fled if the officer left to obtain a warrant." *Id.* at 1238. Based on the facts in *J.M.C.*, we concluded that the officer "had sufficient probable cause to arrest" the juvenile without a warrant for loitering or prowling. *Id.*

Section 856.031's applicability was also directly addressed in *State v. Cortez*, 705 So. 2d 676 (Fla. 3d DCA 1998), which upheld the warrantless arrest of the defendants in that case for loitering or prowling. *Cortez* reasoned that "the defendants were apprehended at roadside, and assuredly would have escaped if the officers had left to obtain a warrant." *Id.* at 679. Thus, *Cortez* dispels any notion that our law requires personal observation of all elements of loitering or prowling when a risk exists that the suspect would likely escape. In circumstances like those presented in *Cortez*—and present in this case—the Florida Legislature has authorized a warrantless arrest pursuant to section 856.031's plain and unambiguous text. *See* § 856.031, Fla. Stat. (2019); *see also Cortez*, 705 So. 2d at 679 (quoting § 856.031).

As was true in *Cortez*, section 856.031 authorized the "roadside" investigation, and potentially a warrantless arrest of the defendant for loitering or prowling. Because the defendant was not found at her place of residence, and she was unable to provide a local address where the police could return with a warrant, the majority's opinion places her outside of the law's reach. If the officer in this case had left to obtain a warrant, he could not serve the warrant from the limited information learned from her foreign passport, which was the only form of identification she had provided the officer at the beginning of the "roadside" investigatory stop.

14

Moreover, when the officer was asked at trial whether she tried "to physically escape" him, he answered "[y]es." Without a local address, the defendant who had already attempted to elude the officer's authority would have likely escaped the reach of law enforcement to execute any warrant for her arrest or to further investigate the suspected crime. We cannot simply overlook the circumstances facing the responding officer. After all, the officer was investigating a suspected crime involving private property which would have been under extremely heightened security given its potential inhabitants, which included the President of the United States and his family at the time of the events in question.

Even if the officer's reasonable suspicion did not amount to probable cause to arrest the defendant for loitering or prowling, the officer was still acting within his lawful duty to inquire as to why the defendant was at the Mar-a-Lago property during his investigatory stop pursuant to section 856.021(2), Florida Statutes, which required him to afford her an opportunity to explain her presence and conduct at Mar-a-Lago. *See* § 856.021(2), Fla. Stat. (2019) (when investigating a loitering or prowling offense, an officer has a legal duty to "afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself or herself and explain his or her presence and conduct").

As pointed out in *N.H. v. State,* 890 So. 2d 514 (Fla. 3d DCA 2005), while the offense of resisting an officer is often referred to as resisting arrest, this is a misnomer. *See id.* at 516 (noting "that the title of § 843.02 is 'resisting [an] officer,' not 'resisting arrest'").

*N.H.* explains that the text of section 843.02, Florida Statutes (2019), unambiguously applies "to any situation where a person willfully interferes with the lawful activities of the police. Nothing indicates that it applies only when police are arresting a suspect, nor does the case law support such a narrow construction of the statute." *Id.* at 516 (citing *Jacobson v. State,* 476 So. 2d 1282, 1287 (Fla. 1985)) ("'section 843.02 . . . does not require that the officer be attempting to arrest the suspect'"); *Kaiser v. State,* 328 So. 2d 570 (Fla. 3d DCA 1976) ("charge of resisting officer with violence, section 843.01, proper when officer has legal right to detain suspect for questioning"); *Simeon v. State,* 778 So. 2d 455 (Fla. 4th DCA 2001) ("providing false information to non-arresting officer sufficient to support a violation of § 843.02"); *K.A.C. v. State,* 707 So. 2d 1175 (Fla. 3d DCA 1998) ("failure of juvenile who was the subject of a lawful investigatory stop for possible truancy violation to identify himself and reveal where he went to school sufficient to constitute a violation of § 843.02"); and *M.C. v.* State, 450 So. 2d 336 (Fla. 5th DCA 1984) ("holding

that interfering with an officer during a temporary detention, such as a stop and frisk, is sufficient to convict under § 842.02")).

Accordingly, I respectfully dissent from the majority's conclusion that the State presented insufficient evidence to support the defendant's conviction for resisting an officer's lawful authority without violence.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***